UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                Plaintiff,

v.                                  No. 20-CR-123-JLS

RAMINDERJIT ASSI,

                Defendant.

## DEFENDANT RAMINDERJIT ASSI'S
## SENTENCING MEMORANDUM



*Attorneys for Defendant Raminderjit Assi*
Robert C. Singer, Esq.
80 East Spring Street
Williamsville, New York  14221
(716) 222-3288
rob@singerlegalpllc.com

**Introduction**

Raminderjit Assi grew up in southern Ontario, Canada, near Burlington and Hamilton. He was raised by his parents, grandparents, and relatives. His parents were first-generation Canadians who worked hard for what they had. And while Raminderjit never wanted for food or clothing, the financial stability of his family was not always steady. That said, his parents and relatives instilled in Raminderjit a strong work ethic and a love for his family. This is something that has guided Raminderjit's decision-making, in positive and negative ways, throughout his life.

Raminderjit Assi finds himself before the Court today because he wanted to be a better provider for his family. This led him to engage in trafficking marijuana in Canada and, later, across the United States border. As the Court will learn, Raminderjit has accepted responsibility for his actions. More importantly, prior to his arrest in the United States, Raminderjit demonstrated a desire and ability to return to a legitimate job and being a hard-working, law-abiding citizen. For the reasons set forth below, the Court should accept the plea agreement in this case and provide a path for Raminderjit to return to work and his family in Canada as quickly as possible.

**Argument**

A.   **Who is Raminderjit Assi?**

Raminderjit Assi is 28 years old. He is a citizen of Canada and has no legal status in the United States. He is single and does not have any children. Raminderjit was raised in southern Ontario by his parents, Mangal, a blue-collar worker, and Babaljit, an office worker. Growing up, Raminderjit did not have any siblings, but he lived in the same house as his grandparents and cousins. Raminderjit's family, both his own and his extended family, were first-generation Canadians. His parents immigrated from India to Canada in the 1990's to escape religious and political persecution (Raminderjit and his family are Sikhs, a religious minority in India, recognized by the United States and Canadian governments as an oppressed and discriminated against class of

persons who qualify for political asylum).  After Raminderjit's parents got established in Ontario, they obtained visas for his mother's parents to enter the country.  Raminder was born in 1995.

Like many first-generation families, Raminderjit was raised in the same house as his relatives.  His grandparents lived with him.  His father's brother and sister also immigrated to Canada and their children, Raminderjit's cousins, also lived in the home.  Things were crowded at times, but the family made ends meet this way and Raminderjit developed a close relationship with his cousins and extended family.

Raminderjit had a generally positive upbringing, but his father's early abuse of alcohol led to some domestic arguments between his mother and father.  Raminder's father's abuse of alcohol sometimes effected his father's ability to hold a job.  This translated into periods of financial instability in the household.  Nonetheless, Raminderjit persevered.

From an early age, Raminderjit learned to work with his hands.  He worked on cars in his driveway and did manual-labor jobs as a child and teenager.  When he matriculated to high school, Raminderjit took many vocational classes that are the Canadian equivalent of BOCES classes in New York.  These classes taught Raminderjit trade work and placed him in internships and apprenticeship programs.  Following graduation, Raminderjit used these skills to obtain two jobs at auto dealerships where he performed mechanic and maintenance tasks on customers' automobiles.  These legitimate jobs kept Raminder busy and productive, but they did not pay as much as he needed to support himself and his loved ones.  He yearned for a job in which he could make more money.

### B. What led to Raminderjit Assi's arrest and conviction?

Marijuana grow operations were nothing new in Ontario.  They existed for years, especially after 2001 when the Canadian government legalized the use of cannabis for medicinal purposes.  Over the next twenty years, attitudes towards marijuana in Canada changed and the push

for legalization grew.  In 2015, Justin Trudeau became the Prime Minister and launched initiatives aimed at forging a path towards legalization.  Much like within New York and in other states within the United States that had legalized or were on the path to legalization, marijuana growers started operations in Canada prior to legalization to help provide a supply chain to processors and commercial sellers.  Sensing this trend and believing that marijuana may supply more income, Raminderjit left a string of legitimate jobs in 2016 and got involved in the marijuana trade.  At first, his involvement in marijuana was confined to Canadian customers, but when Canada legalized marijuana in June 2018, Raminderjit and his partner shifted focus towards figuring out how to ship his crop to the more lucrative and untaxed black market within the United States.  In 2019, Raminderjit and a confederate devised a plan to transport marijuana into the United States using a helicopter.  The two obtained their pilot licenses and a helicopter.  In April 2019, Raminderjit and his confederate piloted a helicopter across the United States border and dropped four bales of marijuana onto Beaver Island State Park in Grand Island, NY.  During the drop, a Border Patrol Agent observed the helicopter and went to investigate.  The bales were discovered and Homeland Security Investigations launched an investigation.

    HSI teamed up with the Royal Canadian Mounted Police (RCMP) to investigate the helicopter incursion.  RCMP helped identify Raminderjit and his confederate as the pilots of the helicopter.  Since Raminder and his confederate violated Canadian drug trafficking laws, RCMP executed search warrants in August 2019 at Raminder's house and arrested Raminder and his confederate.  They were charged with trafficking narcotics and court proceedings commenced in Canada, however during pretrial proceedings, the Canadian judge presiding over the case determined that the search warrants were invalid and dismissed the Crown's case against Raminder and his confederate.

Raminderjit's arrest and prosecution in Canada was a wake-up call and a turning point.  The case clarified for Raminderjit that his efforts to provide for himself and his family through illegal activities was not right and could not continue.  Raminderjit's parents and family leaned on him to return to the values he learned as a child and as a practicing Sikh.  *See* Exhibits A at 2; Exhibit B at 2; Exhibit F.  Raminderjit responded by turning back to his roots.  Over the next two years, Raminderjit disassociated himself from narcotics trafficking.  Since he always liked working with his hands, Raminderjit pursued employment in trade work.  He secured positions with two contractors, AJM Installers and Ray's Contracting, and performed drywall finishing, painting, and general construction as well as maintenance of an Ikea warehouse in Ontario.  *See* Exhibit D.  Raminderjit made $30-$35 (CAD)/hour in these jobs.  He worked 12-16-hour days, working for AJM by day and with Ray's at night.  He was grossing $3000 - $4000 (CAD) per a month in these positions.  He was supporting himself and his family through legitimate means.  Both he and his family were pleased with the progress he made since his arrest in 2019.  All believed that his arrest was a vestige of the past.  That assumption would not prove accurate.

Unbeknown to Raminderjit and his family, like their Canadian counterparts, United States authorities also charged Raminderjit and his confederate with marijuana trafficking in August 2019.  This indictment remained sealed and the United States did not pursue extradition.  In April 2022, Raminderjit boarded a flight from Toronto to Florida.  When he entered the United States, he was arrested on a federal warrant which pertained to this case.  Raminderjit was informed of the indictment in the EDNY.  He and his parents made arrangements for a surety bond and Raminder was released on his own recognizance for the purpose of attending his arraignment in the WDNY.  Raminderjit travelled on his own from New York City to Buffalo to attend his arraignment.  At that time, he was detained and has remained in custody ever since.

**C. The Court should accept the Rule 11(c)(1)(C) agreement negotiated in this case. The incarceration range agreed to by the parties is a fair and reasonable.**

When the government and the defense engaged in plea discussions regarding this matter, prosecutors initially believed that the base offense level for this offense was 18 based on the weight of the marijuana alone, USSG § 2D1.1(a)(5) & (c)(11) (40-60 kg of marijuana). As a CHC I (0 points) and BOL 18, the guidelines would have placed Mr. Assi's sentencing range at 27-33 months which, after credit for acceptance of responsibility pursuant to USSG § 3E1.1(a)&(b), would have reduced the TOL to 15 and a range of 18-24 months. However, it later was discovered that Mr. Assi's use of an aircraft would enhance his base offense level from 18 to 26 pursuant to USSG § 2D1.1(b)(3)(A) – an *eight (8)* level enhancement because this normal two-point enhancement has a provision which sets the BOL at 26 if the offense level is less than 26. *See* USSG § 2D1.1(b)(3)(A). In other words, instead of increasing the adjusted offense level from 18 to 20 (which has a guideline range of 33-41 months) and, after acceptance of responsibility, is decreased to a TOL 17 (24-30 months), the addition of 8 levels leads to an AOL 26 (the sentencing range increases to 60 months because the statutory maximum sentence is five (5) years) which, after acceptance of responsibility, decreases to a TOL 23 (46-57 months). In essence, because of the use of a helicopter in this case, Mr. Assi's recommended sentence **more than doubles** by 28 months/2 ¼ years.

To its credit, the government also believed that the sentencing range suggested by the guidelines was high given the conduct in this case, the weight of the narcotics, the type of narcotic (marijuana), and Mr. Assi's lack of criminal history, so the parties agreed to a Rule 11(c)(1)(C) provision in the plea agreement which lowered the confinement range from 46-57 months to 33-41 months. As set forth below, there are several reasons why this sentencing range is fair and the Court should agree to the Rule 11(c)(1)(C) provision regarding confinement.

5

> i. **The purpose of the aircraft enhancement can be employed in this case without resorting to the sentencing range suggested by the guidelines.**

By way of background, USSG § 2D1.1(b)(3) was added to the sentencing guidelines following passage of the Anti-Drug Abuse Act of 1988. *See* Pub. L. 100-690, Sec. 6453, 102 Stat. 4181 (1988); USSC Amendment 134 (eff. November 1, 1989). The purpose of the amendment was to provide increased penalties to traffickers of narcotics who used non-commercial aircraft and vessels to illegally import narcotics into the United States. The provision was passed with a number of initiatives aimed at strengthening America's tools of enforcement in the War on Drugs. However, Section 6453 was not aimed at marijuana in particular; rather, the provision was aimed at ameliorating the influx of powder cocaine (and its derivative cocaine base) on the streets. In the 1980s, international cartels in Columbia and Mexico imported massive quantities of cocaine into the United States. Cocaine, whether in powder or crack form, ravaged communities by creating dependence, reckless behavior, and lawlessness in our inner-cities. During the Regan Administration, it was determined that more needed to be done on an international scale to reign in the activities of the cartels. The Anti-Drug Abuse Act of 1988 was the second in a series of laws passed by Congress to provide law enforcement with additional tools to combat large-scale traffickers and remove dangerous narcotics from the streets.

Like some provisions of the sentencing guidelines passed during this period (the enhanced penalties and guideline sentences for crack cocaine offenses are just one example), Congress' directive to set the base offense level for use of an aircraft during narcotics trafficking at 26 when the offense level is below 26 has no empirical support. This is not to say that the enhancement has no justification. Practically speaking, the use of a non-commercial aircraft during smuggling includes a level of sophistication that other transportation methods do not. Use of an aircraft also makes detection and interdiction more difficult. However, in passing Section 6435 into law, Congress did not provide empirical evidence explaining why the two-point enhancement

6

provided under USSG § 2D1.1(b)(3) is insufficient to account for conduct with a BOL under 26 when the offense involves a small or smaller quantity of narcotics than normally is imported using aircraft (traffickers using private aircraft frequently transport bulk quantities of narcotics containing dozens of kilos in the shipment) and a less-addictive and dangerous narcotics than the cocaine, heroin, etc.[1]  And when guideline provisions lack empirical support, courts are free to disagree with them.  *See generally Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010).

       The lack of empirical evidence which justifies the eight (8) level enhancement in this case is one of the reasons why the government and the defense negotiated the Rule 11(c)(1)(C) agreement.  The agreement recognizes that while Mr. Assi did use a sophisticated means to traffic narcotics across the border, Mr. Assi also did not import an enormous quantity of marijuana into the United States; marijuana is not as dangerous a narcotic as cocaine, heroin, or fentanyl which have a long history of causing widespread addiction, lawlessness, and death; Mr. Assi does not have a criminal record; and, Mr. Assi's conduct is in a different category than a defendant who is a member of a cartel or organizational trafficker.  This is why the parties essentially agreed to a three (3) level

---

[1] While it is true that marijuana is classified as a Schedule I controlled substance and has been scheduled in that manner since the 1980's, this classification has been subject to scrutiny.  More recently, on August 29, 2023, the Department of Health and Human Services (HHS) recommended to the Drug Enforcement Administration (DEA) that marijuana be rescheduled from Schedule I to Schedule III under the Controlled Substances Act (CSA) following the FDA's 2022-23 review of marijuana.  This move recognizes how marijuana is different from "harder" drugs like cocaine and heroin (Schedule II and I drugs, respectively), because the CSA defines a Schedule III controlled substance as having "**a potential for abuse less than the drugs** or other substances **in schedules I and II**" and "**a currently accepted medical use in treatment** in the United States."  It also states that "**[a]buse** of the drug or other substance **may lead to moderate or low physical dependence** or high psychological dependence."  *See* "Department of Health and Human Services Recommendation to Reschedule Marijuana: Implications for Federal Policy," Congressional Research Service (Sep. 13. 2023), available at: https://crsreports.congress.gov/product/pdf/IN/IN12240 (last accessed 9/19/23) (emphasis added).  This is why a distinction can (and should) be drawn in this case.

enhancement for the use of an aircraft. Such an enhancement is not as large as the guidelines suggest, but still represents a significant enhancement, for an aggravating factor, that is one (1) level above the two (2) level enhancement suggested in USSG § 2D1.1(b)(3). This is why the parties believe this agreement is fair and reasonable.

### ii. Mr. Assi deportable status provides another reason which justifies the Rule 11(c)(1)(C) provision.

Mr. Assi has no legal status in the United States. The offense of conviction also is a deportable offense. As a result, upon Mr. Assi's release from BOP custody, he will immediately be transferred to immigration custody for purposes of deportation. Deportation proceedings regarding Mr. Assi are not expected to be complex – he does not intend to contest his removability. That said, his status does have a practical effect on his detention. First, Mr. Assi is ineligible for transfer to a halfway house near the end of his sentence in this case. Thus, unlike most offenders, he will spend the entirety of his term of confinement in an institution. Second, upon his release from BOP custody, Mr. Assi will be transferred into immigration custody. Given his crime of conviction and lack of status, it is not likely he will be release pending the outcome of his removal proceedings. Thus, it is expected that Mr. Assi will spend additional time in custody following his sentence in this matter until he is deported. This will increase the duration of his time in custody. When crafting the Rule 11(c)(1)(C) provision, the government and the defense took this fact into account when settling on the 33-41-month range advocated for in the plea agreement. This further supports the fairness and reasonableness of the range agreed to by the parties.

### iii. The "Zero Point Offender" amendment set to go into effect on November 1, 2023 demonstrates why the range selected by the parties is fair.

As the PSR correctly notes, in April 2023, the U.S. Sentencing Commission promulgated an Amendment to the guidelines affecting "Zero Point Offenders." *See* PSR at ¶¶75-76. The amendment inserts a new subsection, USSG § 4C1.1, which applies to defendants who are

8

not assigned any criminal history points under USSG §§ 4A1.1 & 4A1.2.  USSG § 4C1.1 provides for a 2-point reduction to a defendant's offense level if the defendant meets the criteria outlined in the new guideline provision.  Mr. Assi is a "Zero Point Offender."  *See* PSR at ¶36.  The Probation Office also believes that he meets all of the criteria set forth in USSG § 4C1.1.  *See* PSR at ¶¶75-76.  The defense agrees with this conclusion.[2]  If the "Zero Point Offender" amendment applies, then the total offense level would reduce from 23 to 21.  This offense level is one (1) level higher than the TOL 20 advocated for in the Rule 11(c)(1)(C) agreement.  The sentencing range suggested under the guidelines for a TOL 21 is 37-46 months.  Under the Rule 11(c)(1)(C) agreement, a TOL 20 has a range of 33-41 months, the low-end of which is only four (4) months less than 37 months and the remainder of which is included in the 37-46-month range.  This is another reason which demonstrates the fairness and reasonableness of the Rule 11(c)(1)(C) agreement.

### iv. 33-41 months of confinement represents a substantial penalty for a first-time offender who trafficked marijuana.

A final reason the parties agreed to the Rule 11(c)(1)(C) agreement is the fact that the sentencing range is above the median range of the statutory maximum punishment for the offense of conviction.  The maximum statutory punishment for the offense of conviction is five (5) years.  The median of that punishment is 2 ½ years.  The 2 ¾ to 3 ½ year sentence in the range agreed to

---

[2] Under the amendment, the possession of "firearm or other dangerous weapon" is disqualifying so long as such possession is "in connection with the offense."  In the interest of full disclosure and as noted in the PSR, when RCMP searched Mr. Assi's residence in Canada in August 2019, RCMP located a Mossberg shotgun in his house.  *See* PSR at ¶31.  This was a licensed and registered firearm in Canada.  The defense does not believe the shotgun disqualifies Mr. Assi from application of the USSG § 4C1.1 amendment because neither RCMP nor HSI have ever taken the position that the Mossberg shotgun was possessed "in connection with" trafficking marijuana in this case.  During discussions between the parties and the Probation Office regarding the shotgun, the government agreed with the defense that it possessed no evidence to connect the shotgun to the marijuana trafficking in this case.  For this reason, the Probation Office did not recommend that an enhancement apply under USSG § 2D1.1(b)(1) and found that Mr. Assi is eligible for the "Zero Point Offender" reduction.  This reasoning is sound and should be adopted by the Court.

by the parties represents a sentence encapsulating 55% to 68% of the total statutory punishment. This is a substantial sentence relative to the maximum punishment that will promote the goals of deterrence, incapacity, and retribution. This is yet another reason why the guideline range advocated for in the Rule 11(c)(1)(C) agreement is fair and reasonable.

> **v. Mr. Assi is remorseful and ashamed of his conduct. He is prepared to move forward and to return to his track-record of being a law-abiding person. And he did so already. This is another reason why the Court should accept the plea agreement.**

Shame. Willingness to change and actual change. Family support. Strong work ethic. Lack of a criminal history. All of these things will help ensure that Raminderjit will not commit misconduct in the future. That is why a sentence in excess of the range agreed to by the parties is not necessary.

Raminderjit recognizes the wrongfulness of his actions. As Raminderjit states in the PSR and Exhibit G, he is ashamed of his actions. He knows what he did was wrong and, if he had to do it all over again, he never would have gotten involved in this in the first place. Raminderjit did not just express his disappointment in himself to authorities and the Court; rather, he has had emotional conversations with his family about the disgrace and hardship his actions have brought upon his family. This realization is an essential step towards rehabilitation. It proves that Raminderjit is ready to move forward from this offense.

Willingness to change also is an important step in the rehabilitation process. Here, "willingness to change" is measured a little differently than normal, though. In most cases before this Court, an offender has a history of convictions and arrests. "Change" usually involves stopping such behavior, shedding criminal associates, and taking an entirely different path in life. In Raminderjit's case, this case represents his only criminal conviction. So, the "change" really relates to recommitting to what Raminderjit always did before his involvement in marijuana trafficking: Staying away from criminal activities and putting in an honest day's work. Prior to 2016,

10

Raminderjit demonstrated an ability to do that. What's more, after his arrest in Canada in August 2019, Raminderjit proved that he not only desired to take a different path, but *did take a different path*. In the two years prior to his arrest in the United States, Raminderjit committed himself to disassociating from criminal activity and finding legitimate employment. *See* Exhibits A, B, and D. He did that. He obtained good-paying jobs with employers who valued his work product and work ethic. He worked two jobs instead of one to pay his debts, support his parents, and refocus his efforts. Working 16-hour days is not easy. The allure of "easy money" via criminal endeavors probably was something that Raminderjit missed. Yet, he did not succumb to the lure of criminal life and kept his nose to the grindstone. This is significant.

In most cases this Court entertains, the question of whether a defendant will reform his or her behavior following a conviction is unknown. The Court is faced with a situation where it must guess as to what the outcome will look like. Here, the Court need not "guess" or take a "leap of faith" regarding what the defendant will do following his release from custody. Mr. Assi already has proven his intentions. Thus, the only question left for the Court to answer is how long such progress will be delayed by the sentence it adjudges. Adjudging a longer term of confinement will not teach Raminderjit something he does not know already; instead, it will just stunt his growth.

Raminderjit also enjoys strong support from his family and friends. *See* Exhibits A & B. Support from family and friends is critical to successful rehabilitation. Studies show that prison inmates who have more contact with their families and who reported positive relationships overall are less likely to be re-incarcerated. *See* Martinez, D. J. & Christian, J., *The familial relationships of former prisoners: Examining the link between residence and informal support mechanisms,* 38 J. OF CONTEMPORARY ETHNOGRAPHY 201–224 (2009). This is because family members provide social control and social support (which inhibit criminal activity). *See* SAMPSON R.J. & J.H. LAUB, CRIME IN THE MAKING: PATHWAYS AND TURNING POINTS THROUGH LIFE (Harvard University Press 1993); Cullen, F.T., J.P.

11

Wright & M.B. Chamlin, *Social support and social reform: A progressive crime control agenda.* 45 CRIME & DELINQUENCY 188-207 (1999); MARUNA, S., R. IMMARIGEON & T.P. LEBEL, EX-OFFENDER REINTEGRATION: THEORY AND PRACTICE 326 (2006), *reprinted in* AFTER CRIME AND PUNISHMENT: PATHWAYS TO OFFENDER REINTEGRATION (Willan Publishing 2004). Family members also facilitate informal social controls that link ex-inmates to churches, law-abiding neighbors, housing, employment, and education and training opportunities that they may not be successful in obtaining on their own. *See generally* PETERSILIA, J., WHEN PRISONERS COME HOME: PAROLE AND PRISONER REENTRY (Oxford University Press 2003); TRAVIS, J., A. SOLOMON & M. WAUL, FROM PRISON TO HOME: THE DIMENSION AND CONSEQUENCES OF PRISONER REENTRY (The Urban Institute 2001). Ex-inmates lacking positive supportive relationships with family are more likely to recidivate. *See id.* The love and support Raminderjit enjoys from his family members makes a longer-term incapacitation unnecessary in this case. This is another reason why the sentencing range agreed to by the parties is fair and reasonable. A longer period of confinement will only delay his progress.

Notwithstanding this case, Raminderjit also has proven himself to be a person who can be a productive, law-abiding citizen. This case remains his only arrest and conviction. Raminderjit has a strong work ethic. He turned his life around when given the opportunity to do so in 2019. Even after his imprisonment in the United States, Raminderjit has not just wasted away his days in prison. As an inmate, he volunteered for the Pawsitive for Heroes program, a service-dog training academy run by Western New York Heroes at the Niagara County Jail. For the last 18 months, Raminderjit



trained two-service dogs who were provided to military veterans in need of a service animal. *See* Exhibit C. His most recently trained dog, Ella, graduated from the program last week and was provided to a Vietnam Veteran. *See id.* Raminderjit also has concerns that his personal use of marijuana contributed to poor judgment, so he enrolled himself in a recovery program offered through BestSelf. *See* Exhibit E. If Raminderjit is confined for a longer period than agreed to by the parties, such a punishment will not just affect the role he plays in his family, but it will disrupt his rehabilitative efforts, to date. This demonstrates why time in jail in excess of the range agreed to by the parties is unnecessary.

\*     \*     \*

Mr. Assi's case does not deserve a response that is long-term and costly. Such a response will not teach him anything more than what he already knows. It will not correct his behavior or aid his rehabilitation from this offense. It will do the opposite and set him backwards. Mr. Assi's choice to help his family is what caused him to violate the law in this case. Sure, he should have known better, but that is sometimes easier said than done. Mr. Assi did not exercise better judgment and that is why he pleaded guilty to this crime. Mr. Assi is a person who has strong family support, a strong work ethic, and is someone who has demonstrated a willingness and ability to change his life and pursue a law-abiding path. He recognizes what he did and why it was wrong. All of these things make time a long-term sentence unnecessary. That is why the Rule 11(c)(1)(C) agreement is fair and reasonable and the Court should approve the plea agreement.

**D. What is a proper sentence in this case?**

First, the Court should not impose a fine in this case. Mr. Assi is not in a position to pay a fine. He has no substantial savings. He has no assets. Upon his return to Canada, he has financial commitments to himself and his loved ones. Beyond the impracticality of collecting a fine which the Probation Office notes, the Court should not adjudge a fine because doing so will

13

interfere with Mr. Assi's successful rehabilitation. Such a penalty is overly punitive, onerous, unfair, and defeats realization of the main goal in this case for all parties: rehabilitation and reintegration into society.

   Second, the Court should agree to the sentencing range in the plea agreement and consider imposing 33 months, the lowest period of confinement within that range of confinement. It is true that Mr. Assi participated in a felony-level narcotics offense which used a sophisticated means to penetrate the border and evade detection, but it also is true that this was his first offense, no one got hurt, the drug was marijuana (which is far less dangerous than other narcotics), and the quantity of marijuana involved was relatively small. Mr. Assi did not evade capture from authorities. He was unaware of the sealed indictment until he was arrested in April 2022. When he learned of its existence, he did not flee and, instead, transported himself to the WDNY, out of custody, to answer for his crime. Later, he pleaded guilty, saving the government and the Court the expense of a trial. On top of that, Mr. Assi has shown remorse and a willingness to change his ways. He regretted his choices back in 2019 and spent two years rehabilitating himself and forging a legitimate existence again. But for his arrest in this case, he would have continued on that same path.

   Confinement is a tool used to punish a defendant for his transgressions. Undoubtedly, Mr. Assi owes a debt to society for his actions. He is prepared to pay that debt now. In fashioning that debt, the Court needs to ask itself what a sentence to confinement in excess of 33 months will truly achieve other than punishment. The goals of deterrence are achieved by a sentence that is 55% of the maximum statutory penalty. Society is protected by such a sentence. Mr. Assi has demonstrated a willingness to rehabilitate himself. And as for punishment/retribution, longer prison sentences at the higher end of the guideline range usually are reserved for defendants who do not "get it," who are repeat offenders, or who engage in misconduct that is so serious that no other sentence is appropriate. Mr. Assi and the facts of this case do not meet such criteria. A

sentence above 33 months or even above the middle-point of the 33–41-month range goes well beyond whatever is necessary to ensure that justice is delivered in this case. It also may stunt the positive gains Mr. Assi has made over the last two years to get back "on track." That is why a sentence at the low-end of the guideline range is fair and reasonable.

Third, to the extent the Court adjudges a term of supervised release, it should do so with knowledge that supervision will discontinue when Mr. Assi returns to Canada. As the PSR notes, supervision is not possible in a different country. As such, any term of supervised release adjudged should be minimal and track the conditions recommended by the Probation Office.

## Conclusion

For the reasons set forth above, this Court should impose a sentence of 33 months confinement; no fine; a term of supervised release as applicable; and, a mandatory assessment of $100.00. Such a sentence is sufficient, but not greater than necessary to realize the goals of sentencing and will help ensure that Mr. Assi returns home quickly, so he can get back to work, and continue on his path towards redemption.

Dated:   September 19, 2023
         Williamsville, NY

**SINGER LEGAL PLLC**
*Attorneys for Defendant Raminderjit Assi*

By:   s/ Robert C. Singer, Esq.
         Robert C. Singer, Esq.
80 East Spring Street
Williamsville, New York  14221
(716) 222-3288
rob@singerlegalpllc.com